IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

_____

AARON C. W.,

                Plaintiff,

     v.                          Civil Action No.
                                          5:22-CV-1028 (LEK/DEP)

COMMISSIONER OF SOCIAL SECURITY,

                Defendant.

_____

APPEARANCES:                OF COUNSEL:

FOR PLAINTIFF

OLINSKY LAW GROUP        KAELIN RICHARD, ESQ.
250 South Clinton Street, Suite 210    HOWARD D. OLINSKY, ESQ.
Syracuse, NY 13202

FOR DEFENDANT

SOCIAL SECURITY ADMIN.      CANDACE BROWN CASEY, ESQ.
OFFICE OF GENERAL COUNSEL
6401 Security Boulevard
Baltimore, MD 21235

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

REPORT AND RECOMMENDATION

Plaintiff has commenced this proceeding, pursuant to 42 U.S.C. §§

405(g) and 1383(c)(3), to challenge a determination of the Commissioner of

Social Security ("Commissioner") finding that he was not disabled during the relevant period and, accordingly, is ineligible for the supplemental security income benefits ("SSI") for which he has applied. The matter has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b) and Northern District of New York Local Rule 72.3. For the reasons set forth below, I recommend a finding that the Commissioner's determination resulted from the application of proper legal principles and is supported by substantial evidence.

I.      BACKGROUND

Plaintiff was born in June of 1975, and is currently forty-eight years of age. He was forty-five years old on June 12, 2021, the date upon which he filed his application for benefits. Plaintiff measures six feet and four inches in height, and weighed approximately two hundred and thirty-nine pounds during the relevant period. Plaintiff has stated that he typically lives with his wife, but that he has been living for a portion of the relevant period with his parents because his mother is a nurse practitioner and able to help care for him.

In terms of education, plaintiff reports that he graduated from high school and earned an associate degree in psychology. Evidence in the record documents that plaintiff had been attending school during a portion

of the relevant period in an effort to obtain a bachelor's degree.  He has worked in the past most relevantly as an elevator mechanic helper.

Plaintiff alleges that he suffers primarily from the effects of chronic heart failure, including fatigue, shortness of breath, and lightheadedness. As is relevant to his application, plaintiff has treated for his cardiac and related impairments with sources at the Lehigh Valley Health Network including Dr. Dzanan Ramic; Dr. Vishal Parikh from Rochester Regional Health Sands-Constellation Heart Institute; and sources at Upstate University Hospital and Cortland Regional Medical Center related to an extended acute hospitalization.

At the first administrative hearing related to his claim for disability benefits, held on May 29, 2020, plaintiff testified that he has difficulty doing much of anything because of lightheadedness related to his cardiomyopathy.  He reported that he cannot drive, needs help getting in and out of the shower, dressing and walking, and does not shop, cook, do dishes, clean, do laundry, exercise, or do anything outside of the house. Plaintiff stated that he relies on his parents and wife to perform most tasks for him.  He showers once per week and typically spends most of the day in bed.  Plaintiff additionally testified that, because of attention deficit and hyperactivity disorder ("ADHD"), he has difficulty concentrating and with

3

forgetting things, but he is unable to take medication for that impairment because of his heart.

At the second administrative hearing, conducted on February 2, 2021, plaintiff testified that he had been recently hospitalized from October to December of 2020, related to fluid build-up in his lung and a blood clot.[1] He reiterated that he spends most of his time in bed or on the couch, and that he needs to stand up slowly because he becomes lightheaded.

At the most recent administrative hearing, held on September 8, 2021, plaintiff reported that he was at that time staying at his parents' house so that his mother could assist him with care tasks and caring for his daughter.  He continued to report experiencing lightheadedness that impacts his ability to stand.

II.    PROCEDURAL HISTORY

    A.    Proceedings Before the Agency

Plaintiff applied for SSI payments under Title XVI of the Social Security Act on June 12, 2018.  Administrative Law Judge ("ALJ") Scot Gulick held administrative hearings related to that application on May 29, 2020, February 2, 2021, and September 8, 2021, and subsequently issued

---

[1]    The records do not appear to document this alleged hospitalization, with the only extended hospitalization evident in the medical records being in November and December of 2019 for a left-side pleural effusion.

a decision on September 27, 2021, finding that plaintiff was not disabled at the relevant times. That opinion became a final determination of the agency on August 8, 2022, when the Social Security Appeals Council denied plaintiff's request for review of the ALJ's decision.

B.    The ALJ's Decision

In his decision, ALJ Gulick applied the familiar, five-step sequential test for determining disability. At step one, he found that plaintiff had not engaged in substantial gainful activity during the relevant period. The ALJ next found at step two that plaintiff suffers from severe impairments that impose more than minimal limitations on his ability to perform basic work functions, including obesity, chronic heart failure, cardiomyopathy, and hypertension. As part of his step two finding, ALJ Gulick additionally found that plaintiff's alleged status post mesh repair of an umbilical hernia and substance use disorder do not rise to the level of severe impairments.

At step three, ALJ Gulick examined the governing regulations of the Commissioner setting forth presumptively disabling conditions (the "Listings"), *see* 20 C.F.R. Pt. 404, Subpt. P, App. 1, and concluded that plaintiff's conditions do not meet or medically equal any of the listed conditions set forth in those regulations, specifically considering Listing 4.02 and Social Security Ruling ("SSR") 19-2p, the latter of which is related

5

to the assessment of obesity.

ALJ Gulick next surveyed the available record evidence and concluded that, during the relevant period, plaintiff retained the residual functional capacity ("RFC") to perform a range of work at the light exertional level, as defined by the controlling regulations, with the following exceptions:

> from June 12, 2017 through December 1, 2019, lifting 20 pounds occasionally and 10 pounds frequently; carrying 20 pounds occasionally and 10 pounds frequently and sitting for 6 hours, standing for 3 hours, [and] walking for 3 hours of an 8 hour day. He can operate foot controls with right foot frequently, he can operate foot controls with left foot frequently. From June 12, 2017 to present day, the claimant can climb ramps and stairs occasionally, never climb ladder, ropes, or scaffolds, balance occasionally, stoop occasionally, kneel occasionally, crouch occasionally, and crawl occasionally. From June 12, 2017 through December 1, 2019, the claimant can work at unprotected heights occasionally, [near] moving mechanical parts occasionally, and operating a motor vehicle frequently, in humidity and wetness frequently, in dusts, odors, fumes, and pulmonary irritants frequently, in extreme cold frequently, in vibration frequently. From December 1, 2019 to present day, lifting 20 pounds occasionally and 10 pounds frequently; carrying 20 pounds occasionally and 10 pounds frequently and sitting 6 hours, standing for 2 hours and walking for 2 hours of an 8 hour day. From December 1, 2019 to the present day, the claimant can climb ramps and stairs occasionally, never climb ladders, ropes, or scaffolds, balance occasionally, stoop occasionally, kneel occasionally, crouch occasionally and crawl

occasionally. From December 1, 2019 to the present day, the claimant can never work at unprotected heights, never [near] moving mechanical parts, in humidity and wetness occasionally, in dust, odors, fumes and pulmonary irritants occasionally, in extreme cold occasionally, [and] in extreme heat occasionally.

ALJ Gulick went on to step four and concluded that, given his condition, plaintiff is unable to perform any of his past relevant work. The ALJ then proceeded to step five and, after eliciting testimony from a vocational expert, found that plaintiff remained able to perform available work in the national economy, citing as representative positions, with respect to the period of June 12, 2017 through December 1, 2019, the jobs of insert machine operator, electric sub-assembler and small parts assembler, and for December 2, 2019 to the present, the jobs of document preparer, circuit board assembler, and egg processor. Based upon these findings, ALJ Gulick determined that plaintiff was not disabled at the relevant times.

C.    This Action

Plaintiff commenced this action on September 30, 2022.[2]  In support

---

[2]    This action is timely, and the Commissioner does not argue otherwise. It has been treated in accordance with the procedures set forth in the Supplemental Social Security Rules and General Order No. 18. Under those provisions, the court treats the action procedurally as if cross-motions for judgment on the pleadings have been filed pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.

of his challenge to the ALJ's determination, plaintiff argues that (1) the ALJ

failed to appropriately assess the opinions from treating cardiologist Dr.

Parikh, and (2) failed to properly and adequately assess whether plaintiff's

chronic heart failure meets or equals Listing 4.02.  Dkt. No. 10.

Oral argument was conducted in this matter, by telephone, on

September 12, 2023, at which time decision was reserved.

III.   DISCUSSION

A.   Scope of Review

A court's review under 42 U.S.C. § 405(g) and 1383(c)(3) of a final

decision by the Commissioner is subject to a "very deferential" standard of

review, and is limited to analyzing whether the correct legal standards were

applied, and whether the decision is supported by substantial evidence.

*Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012);

*Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2002); *Shaw v. Chater*, 221

F.3d 126, 131 (2d Cir. 2000); *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir.

1998).  Where there is reasonable doubt as to whether an ALJ has applied

the proper legal standards, the decision should not be affirmed even

though the ultimate conclusion reached is arguably supported by

substantial evidence.  *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987).

If, however, the correct legal standards have been applied, and the ALJ's

8

findings are supported by substantial evidence, those findings are conclusive, and the decision will withstand judicial scrutiny regardless of whether the reviewing court might have reached a contrary result if acting as the trier of fact. *Veino*, 312 F.3d at 586; *Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988); *see also* 42 U.S.C. § 405(g).

The term "substantial evidence" has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 390, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *accord, Jasinski v. Barnhart*, 341 F.3d 182, 184 (2d Cir. 2003). To be substantial, there must be "more than a mere scintilla" of evidence scattered throughout the administrative record. *Richardson*, 402 U.S. at 401 (internal quotation marks omitted); *Williams*, 859 F.3d at 258. "To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining evidence from both sides, because an analysis on the substantiality of the evidence must also include that which detracts from its weight." *Williams*, 859 F.2d at 258 (citing *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951); *Mongeur v. Hechler*, 722 F.2d 1033, 1038 (2d Cir. 1983)).

    B.    <u>Disability Determination: The Five-Step Evaluation Process</u>

The Social Security Act ("Act") defines "disability" to include the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]"  42 U.S.C. § 423(d)(1)(A).  In addition, the Act requires that a claimant's

> physical or mental impairment or impairments [be] of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

*Id*. § 423(d)(2)(A).

The agency has prescribed a five-step evaluative process to be employed in determining whether an individual is disabled.  *See* 20 C.F.R. §§ 404.1520, 416.920.  The first step requires a determination of whether the claimant is engaged in substantial gainful activity ("SGA"); if so, then the claimant is not disabled, and the inquiry need proceed no further.  *Id*. §§ 404.1520(b), 416.920(b).  If the claimant has not worked at a level constituting SGA, then the second step involves an examination of whether the claimant has a severe impairment or combination of impairments that

significantly restricts his or her physical or mental ability to perform basic work activities. *Id.* §§ 404.1520(c), 416.920(c). If the claimant is found to suffer from such an impairment, the agency must next determine whether it meets or equals an impairment listed in Appendix 1 of the regulations. *Id.* §§ 404.1520(d), 416.920(d); *see also id.* Part 404, Subpt. P, App. 1. If so, then the claimant is "presumptively disabled." *Martone v. Apfel*, 70 F. Supp. 2d 145, 149 (N.D.N.Y. 1999) (citing *Ferraris v. Heckler*, 728 F.2d 582, 584 (2d Cir. 1984)); 20 C.F.R. §§ 404.1520(d), 416.920(d).

If the claimant is not presumptively disabled, step four requires an assessment of whether the claimant's RFC precludes the performance of his or her past relevant work. 20 C.F.R. §§ 404.1520(e), (f), 416.920(e), (f). If it is determined that it does, then as a final matter, at step five the agency must examine whether the claimant can do any other work. *Id.* §§ 404.1520(g), 416.920(g).

The burden of showing that the claimant cannot perform past work lies with the claimant. *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996); *Ferraris*, 728 F.2d at 584. Once that burden has been satisfied, however, it becomes incumbent on the agency to prove that the claimant is capable of performing other available work. *Perez*, 77 F.3d at 46. In deciding whether that burden has been met, the ALJ should consider the claimant's RFC,

11

age, education, past work experience, and transferability of skills. *Ferraris*, 728 F.2d at 585; *Martone*, 70 F. Supp. 2d at 150.

    C.    <u>Analysis</u>

        1.    <u>The ALJ's Assessment of Dr. Parikh's Opinions</u>

Plaintiff first argues that the ALJ failed to properly evaluate the opinion evidence submitted by treating cardiologist Dr. Vishal Parikh. Specifically, he argues that the rationale provided by the ALJ for affording those opinions less weight is not supported by substantial evidence because (1) the ALJ erroneously misattributed an echocardiogram to Dr. Parikh, when in fact he only ordered the testing but did not personally conduct it, an error that undermines the ALJ's assessment of the supportability factor given that he did not cite to any other evidence related to the supportability finding,[3] (2) the ALJ did not provide an adequate explanation of how the record evidence is inconsistent with Dr. Parikh's opinion, and specifically failed to support his assertion that plaintiff's condition improved to some extent after the echocardiogram findings were recorded in late-2019 and early 2020, and (3) the ALJ relied heavily on the August 2020 echocardiogram results without acknowledging that the

---

[3]    Plaintiff acknowledges that the record does not appear to contain any treatment notes from Dr. Parikh. Dkt. No. 10, at 14.

assessment was noted to be "technically difficult" due to poor acoustic windows.

Because plaintiff's application was filed after March 27, 2017, this case is subject to the amended regulations regarding opinion evidence. Under those regulations, the Commissioner "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s), . . . including those from your medical sources," but rather will consider whether those opinions are persuasive by primarily considering whether the opinions are supported by and consistent with the record in the case. 20 C.F.R. § 416.920c(a); *see* 82 Fed. Reg. 5844-01, 2017 WL 168819, at *5853 (stating that, in enacting the new regulations, the agency was explicitly "not retaining the treating source rule"). An ALJ must articulate in his or her determination as to how persuasive he or she finds all of the medical opinions and explain how he or she considered the supportability[4] and consistency[5] of those opinions. 20 C.F.R. §

---

[4]    On the matter of supportability, the regulations state that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinion or prior administrative medical findings(s) will be." 20 C.F.R. § 416.920c(c)(1).

[5]    On the matter of consistency, the regulations state that "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the

416.920c(b).  The ALJ also may – but is not required to – explain how he or she considered the other relevant enumerated factors related to the source's relationship with the claimant, including the length of any treatment relationship, the frequency of examinations by the source and the purpose and extent of the treatment relationship, whether the source had an examining relationship with the claimant, whether the source specializes in an area of care, and any other factors that are relevant to the persuasiveness of that source's opinion.  20 C.F.R. § 416.920c(c).

In a letter dated May 15, 2020, Dr. Parikh stated that plaintiff was under his care for congestive heart failure, and that such condition causes plaintiff to have shortness of breath and fatigue, to require frequent rest breaks, and to experience limitations in his ability to push, pull, and lift heavy items.  AT 1303.  Dr. Parikh additionally noted that plaintiff was previously diagnosed with ADHD, but cannot take Adderall to address that condition due to his cardiac condition, and as a result the condition might make it difficult for him to concentrate and focus.  *Id.*

---

medical opinion(s) or prior administrative medical finding(s) will be."  20 C.F.R. § 416.920c(c)(2).

On March 4, 2021, Dr. Parikh co-signed a medical source statement with registered nurse Daniel vander Jagt, in which it was noted that plaintiff has a diagnosis of systolic heart failure with a fair or good prognosis.  AT 1469.  The statement reflects that plaintiff's symptoms consist of shortness of breath, and that dizziness and more frequent urination are side effects associated with the plaintiff's prescribed medications.  AT 1469.  In the statement the authors have opined that plaintiff is able to sit for twenty minutes at one time and about two hours in an eight-hour day, stand for five minutes at one time and less than two hours in an eight-hour day, occasionally lift and carry ten pounds or less but never lift greater amounts of weight, frequently perform motions with his neck, occasionally use his arms, hands, and fingers, and would require unscheduled breaks every hour for thirty minutes each, would be off-task more than twenty-percent of the workday, and would likely be absent from work more than four days per month.[6]  AT 1470-71.  The authors further noted that they could not comment regarding whether the above limitations were present since June 12, 2017, because they had only been treating plaintiff since February 3, 2020.  AT 1472.

---

[6]    The form also reflects that plaintiff has various postural restrictions, but specifies that those are related to plaintiff's umbilical hernia, not his cardiac condition.

The ALJ deemed both of these statements to be unpersuasive, finding that they (1) are not supported by "Dr. Parikh's own" echocardiogram dated August 7, 2020, (2) are inconsistent with evidence in the record that shows improvement in the plaintiff's condition, including an echocardiogram dated January 30, 2020, that showed, among other things, a rising ejection fraction of twenty-five-to-thirty-percent, and a July 2020 treatment record in which plaintiff reporting being able to lift items that weigh more than twenty pounds.  AT 20-21.

Plaintiff first takes issue with the ALJ's assessment of the supportability factor, arguing that the only evidence the ALJ cited in support of that finding – the echocardiogram from August 2020 – was in fact not conducted by Dr. Parikh, and therefore does not constitute a proper source of support related to this factor.  That argument notwithstanding, I agree with the Commissioner that the report was properly considered under the supportability factor.  Although a different physician apparently performed and/or interpreted the echocardiogram, the report for that procedure indicates that Dr. Parikh was the provider who ordered it, and thus there is no logical reason to believe he would not have been aware of it or that it would not be included in his own treatment notes.  The echocardiogram was also performed at Rochester Regional Health Sands-Constellation

16

Heart Institute, the same practice at which Dr. Parikh appears to work.  AT

1303 (letter from Dr. Parikh with that practice's letterhead); 1471 (listing

"RRH SCHI Heart Failure" as the health care facility name in the signature

section of the medical source statement).  Because the echocardiogram

represents treatment ordered by Dr. Parikh at the institution where he

practices, I perceive no error in the ALJ's consideration of that report as

part of his assessment of the supportability factor.

Nor do I believe that the ALJ's interpretation of the echocardiogram

report, especially in light of the other available evidence, is necessarily

unreasonable or inappropriate to the extent he concluded it does not serve

to provide an explanation for the fairly significant restrictions included in Dr.

Parikh's opinions.[7]  Specifically, the echocardiogram was in existence well

before Dr. Parikh rendered the March 2021 opinion, and Dr. Parikh does

not explain, absent citing to shortness of breath and dizziness, how an

---

[7]  As to plaintiff's argument that the ALJ should not have relied heavily on the August 2020 echocardiogram results because it is noted in the report that the exam was "technically difficult due to poor acoustic window," he has offered no persuasive argument as to why that notation would invalidate or call into question the assessed ejection fraction specifically.  Notably, the only specific finding where the report indicates applicability of technical difficulty due to poor acoustic window is related to GLS, or global longitudinal strain.  AT 1355.  There is no indication in the report that the poor acoustic window in anyway affected the ability to appropriately and accurately assess left ventricular ejection fraction, or any of the other various findings noted in the report.  Indeed, Dr. Krishnamurthi, a cardiologist, relied on that report when rendering his opinion, and did not indicate that the report was unreliable despite being aware of the fact the study was described as technically difficult.

ejection fraction of sixty-one-percent, or any of the other findings in that report, suggests the level of restrictions reflected in his opinion. Although relying solely on such a technical medical report runs the risk of crossing the line of interpreting raw medical data, there is, unfortunately, very little evidence relevant to the supportability factor in the record, and I cannot say that the ALJ was unreasonable for concluding that the report simply does not appear to provide an explanation as to why Dr. Parikh thought such limitations were warranted. Further, the ALJ did not, in fact, rely wholly on his own interpretation of the August 2020 echocardiogram, given that medical expert Dr. Krishnamurthi also considered that report when rendering his opinion, and the ALJ therefore had the benefit of an interpretation by a medical source related to those findings. AT 45-51.

Plaintiff further argues that the fact that the record does not contain any treatment records from Dr. Parikh, despite the fact he stated he has treated plaintiff approximately every three months since February 2020, creates a gap in the record that the ALJ failed to address. Under the applicable regulations, the agency has a responsibility to assist the plaintiff with the developing of a complete record, which is defined as the claimant's complete medical history for at least the twelve months preceding the month in which he or she filed their disability application. 20 C.F.R. §

416.912(b).  In doing so, the agency must make "every reasonable effort to help you get medical evidence from your own medical sources and entities that maintain your medical sources' evidence when you give us permission to request the reports."  20 C.F.R. § 416.912(b).  "Every reasonable effort" is defined as an initial request for evidence and, at any time between ten and twenty calendar days after the initial request, one follow-up request.  20 C.F.R. § 416.912(b)(i).  However, it is generally recognized that the "mere absence of some medical records is insufficient to show that the ALJ failed in her duty or that reversible error occurred."  *Jason C. v. Berryhill*, 17-CV-1106, 2019 WL 1409804, at *5 (N.D.N.Y. Mar. 28, 2019) (Dancks, M.J.).  Rather, [a]n ALJ has taken reasonable steps to complete the medical record when she asks claimant's attorney at a hearing if the medical records before her are complete, and the attorney answers affirmatively."  *Jason C.*, 2019 WL 1409804, at *5 (citing *Orts v. Astrue*, 11-CV-0512, 2013 WL 85071, at *3 (N.D.N.Y. Jan. 7, 2013)).  In the end, although the ALJ has a shared responsibility to develop the record, "claimants and their appointed representatives have the primary responsibility under the Act to provide evidence in support of their disability or blindness claims," such that they are expected to "make good faith

efforts to ensure [the Commissioner] receive[s] complete evidence."  SSR 17-4p.

Plaintiff informed the ALJ in a letter dated April 20, 2020, that he had requested records from the Sands-Constellation Heart Institute, and stated that he was making diligent efforts to obtain those.  AT 466.  On May 20, 2020, plaintiff informed the ALJ by letter that he was submitting one page of notes from that facility to be added to the exhibit file; he did not indicate in the letter that records from that facility were still outstanding.  AT 470. Plaintiff then notified the ALJ in a January 12, 2021, letter that further evidence from that facility had been requested, and that diligent efforts were being made to obtain the missing evidence.  AT 504.  On March 4, 2021, plaintiff submitted the medical source statement of Dr. Parikh to be added to the exhibit file.  AT 508.  Plaintiff subsequently requested on March 25, 2021, that the ALJ issue a subpoena for outstanding records from another non-cardiac provider, but did not make any request for assistance in obtaining Dr. Parikh's treatment records.  AT 509.  On July 15, 2021, plaintiff again informed the ALJ that evidence from Sands-Constellation Heart Institute was requested but not yet received, although plaintiff represented that he was making diligent efforts to obtain the missing records.  AT 518.  Plaintiff subsequently informed the ALJ on

August 11, 2021, that three pages of records from that facility were being submitted for inclusion in the exhibit file; there is no indication in this letter that further records from that facility were outstanding.  AT 519.  At the most recent administrative hearing, which is the only hearing to take place after the date on which Dr. Parikh purportedly began treating plaintiff, the ALJ asked the plaintiff's representative whether the record was complete, to which the representative responded, "I understand that it is, Your Honor." AT 68.

As the Commissioner argues, based on plaintiff's representative's own representations to the ALJ and failure to request assistance or even inform the ALJ that Dr. Parikh's records still needed to be obtained, there is nothing within the record to suggest that the ALJ should have been aware that records from Dr. Parikh were outstanding so as to trigger a duty to request that evidence.  *See Moody v. Comm'r of Soc. Sec.*, 848 F. App'x 470, 471 (2d Cir. 2021) (finding the ALJ adequately developed the record where he provided counsel with additional time to supplement the record after the first hearing and counsel did not subsequently indicate that any outstanding documents remained by the second hearing); *Curley v. Comm'r of Soc. Sec.*, 808 F. App'x 41, 44 (2d Cir. 2020) (rejecting argument that the ALJ failed to develop the record by not seeking records

21

from a treating source because plaintiff's representative did not inform the ALJ that any such records were still outstanding). As a result, I find that the ALJ did not neglect his duty to develop the record related to the treatment notes of Dr. Parikh.

Turning to the ALJ's assessment of the consistency factor, the ALJ found that Dr. Parikh's fairly limiting restrictions are inconsistent with evidence that plaintiff's chronic heart failure improved to some extent following the acute exacerbation documented in the record, pointing to the echocardiogram from January 2020 that showed plaintiff's left ventricle ejection fraction had increased from fifteen-percent to twenty-five-to-thirty-percent after hospitalization, and a July 2020 treatment record in which plaintiff reported he was able to lift items that weigh more than twenty pounds. Plaintiff argues that he suffers from far greater ongoing symptoms than the ALJ acknowledged, including shortness of breath, other lung-related issues, fatigue, chest pain, lower extremity edema, and fluid in his lung. Dkt. No.10, at 18-19. However, plaintiff's discussion of the ostensibly favorable evidence ignores the fact that those observations of serious symptoms all occurred in the context of his acute exacerbation with fluid build-up in his lung that lasted from November 2019 through approximately February of 2020. Outside of this period of exacerbation, there is no

medical evidence to suggest the presence of ongoing symptoms such as shortness of breath or edema.  Treatment notes from 2018 indicate that plaintiff was attending college classes in an effort to obtain a bachelor's degree, as well as reports that he engaged in physical activity including lifting weights, martial arts, and going to the gym.  AT 607, 898, 932.  In fact, in October 2018, plaintiff reported that "I function perfectly fine" regarding activities of daily living.  AT 932.  In November 2018, an echocardiogram showed a left ventricle ejection fraction of fifty-five percent.  AT 605.  On January 14, 2020, plaintiff reported feeling "very well" following his hospitalization and he was noted to be improving albeit with some ongoing fluid collection in his lung.  AT 1316.  An echocardiogram performed on January 20, 2020, showed that plaintiff's left ventricle ejection fraction had improved from the fifteen-percent it had been in November 2019 to twenty-five-to-thirty percent.  AT 1159.  By the end of February 2020, it was noted that the size of his pleural fluid collection was continuing to decrease with treatment.  AT 1330.  By July 2020, plaintiff reported to a provider that he had been lifting items greater than twenty pounds when he had to help with something at his church.  AT 1366.  As was already discussed, an echocardiogram from August 2020 found that plaintiff's left ventricle ejection fraction had increased by that time to sixty-one percent.

AT 1355.  There are very few further relevant records, and certainly none to suggest that plaintiff continued to experience significant symptoms related to his cardiac impairment following recovery from the acute episode of decompensation he experienced in late 2019 and early 2020.  Further, a note from his substance abuse treatment provider in February 2021 indicated that plaintiff reported moving in with his mother, not because he required assistance with daily activities, but to keep him accountable in his sobriety and because his mother had joint custody of his daughter.  AT 1543.  My assessment of the evidence in the record therefore assures me that the ALJ's conclusion that plaintiff's condition had improved to an appreciable degree following his acute exacerbation is a reasonable interpretation of that evidence.

In his decision, the ALJ discussed that although plaintiff reported ongoing symptoms of pain, shortness of breath, and swelling, notes of physical examinations of the plaintiff typically did not document any such distress, and that, although he experienced a period of low ejection fraction with other symptoms, those symptoms have not returned and his ejection fraction has improved significantly.  AT 18-19.  The ALJ also noted that plaintiff reported in July 2020 that he was then able to lift items weighing more than twenty pounds, and that plaintiff was undertaking only

24

conservative treatments such as lisinopril and Lasix to manage his cardiac impairment.  AT 18-19.  This discussion of the evidence, which includes specific explanations related to some of the ALJ's findings, shows that he properly considered the evidence and provides additional context for the consistency finding regarding Dr. Parikh's opinion.

In the end, plaintiff appears to fault the ALJ for failing to cite more than a few examples of evidence to support his rejection of Dr. Parikh's opined limitations, but fails to point to evidence which would suggest that he is limited to a greater extent than the ALJ found.  The treatment evidence related to plaintiff's cardiac condition, with the exception of the period during his hospitalization, is admittedly somewhat sparse, yet that does not mean that the ALJ lacked sufficient evidence to render a conclusion regarding disability.  In the end, it is plaintiff's burden to produce evidence in support of his allegations of disability; the ALJ then must make findings that comply with the relevant regulations and are supported by substantial evidence.  Because plaintiff has failed to point to evidence to support that he experienced significant ongoing limitations for a period of twelve months or more, I find that the ALJ's findings regarding Dr. Parikh's opinion are supported by substantial evidence.

Lastly, because I find no error in the ALJ's assessment of the evidence or of the consistency and supportability factors related to finding Dr. Parikh's opinion unpersuasive, I also find no error in the ALJ relying on similar evidence when finding the opinion of the medical expert, Dr. Krishnamurthi, to be persuasive.  The ALJ clearly considered the factors of supportability and consistency also related to that opinion and, given that I find no error in his overall assessment of the record evidence, there are no grounds apparent for second-guessing the ALJ's reliance on Dr. Krishnamurthi's opinion.

### 2.    The ALJ's Assessment of Listing 4.02

Plaintiff also argues that the ALJ erred in failing to provide an appropriate explanation for his finding that plaintiff's chronic heart failure did not meet or equal the requirements of Listing 4.02.  Plaintiff argues that an explanation is required given the evidence showing that he had documented left ventricular ejection fractions of less than thirty-percent during the relevant time period, and in light of his reports of symptoms related to ischemic cardiomyopathy, including shortness of breath, lower extremity swelling, fatigue, chest pain, and more.

Listing 4.02, related to chronic heart failure, requires a claimant to

show that he or she experienced that condition

> while on a regimen of prescribed treatment, with the symptoms and signs described in 4.00D2.[8] The required level of severity for this impairment is met when the requirements in *both A and B* are satisfied.
>
> A. Medically documented presence of one of the following:
>   1. Systolic failure (see 4.00D1a(i)), with left ventricular end diastolic dimensions greater than 6.0cm or ejection fraction of 30 percent or less during a period of stability (not during an episode of acute heart failure); or
>   2. Diastolic failure (see 4.00D1a(ii)), with left ventricular posterior wall plus septal thickness totaling 2.5cm or greater on imaging, with an enlarged left atrium greater than or equal to 4.5cm, with normal or elevated ejection fraction during a period of stability (not during an episode of acute heart failure);
>
> AND
>
> B. Resulting in one of the following:
>   1. Persistent symptoms of heart failure which very seriously limit the ability to independently initiate, sustain, or complete activities of daily living in an individual for whom an MC, preferably one experienced in the care of patients

---

[8]   Those symptoms include easy fatigue, weakness, shortness of breath, cough, chest discomfort, cardiac arrythmias resulting in palpitations, lightheadedness or fainting, and signs of congestion such as hepatomegaly, ascites, increase jugular venous distension or pressure, rales, peripheral edema, or rapid weight gain.  20 C.F.R. Pt. 404, Subpt. P, App. 1, at 4.00D2.

with cardiovascular disease, has concluded that the performance of an exercise test would present a significant risk to the individual; or

2. Three or more separate episodes of acute congestive heart failure within a consecutive 12-month period (see 4.00A3e), with evidence of fluid retention (see 4.002b(ii)) from clinical and imaging assessments at the time of the episodes, requiring acute extended physician intervention such as hospitalization or emergency room treatment for 12 hours or more, separated by periods of stabilization (see 4.00D4c); or

3. Inability to perform on an exercise tolerance test at a workload equivalent to 5 METs or less due to:

    a. Dyspnea, fatigue, palpitations, or chest discomfort; or

    b. Three or more consecutive premature ventricular contractions (ventricular tachycardia), or increasing frequency of ventricular ectopy with at least 6 premature ventricular contractions per minute; or

    c. Decrease of 10 mm Hg or more in systolic pressure below the baseline systolic blood pressure or the preceding systolic pressure measured during exercise (see 4.00D4d) due to left ventricular dysfunction, despite an increase in workload; or

    d. Signs attributable to inadequate cerebral perfusion, such as ataxic gait or mental confusion.

20 C.F.R. Pt. 404, Subpt. P, App. 1, at 4.02.

I acknowledge that the ALJ's analysis of Listing 4.02 in the step three section of his decision is somewhat perfunctory, in that he merely states that there is "no evidence" of any of the relevant criteria related to that listing.  AT 15-16.  However, the fact that the ALJ utilized a boilerplate statement that essentially stated the requirements of the listing is not as inherently fatal as plaintiff asserts.[9]  Rather, the court must assess the ALJ's decision as a whole, which included a discussion of the evidence related to plaintiff's cardiac treatment in the portion of the decision where the ALJ assessed the plaintiff's RFC.

---

[9]    I note that the case plaintiff cites in support of his argument is distinguishable.  In *Frank K. v. Kijakazi*, the ALJ did similarly state in his step three section that there was "no evidence" that the plaintiff in that case demonstrated that the criteria of Listing 4.02 were met, but in contrast the evidence in that case clearly showed that the plaintiff had ejection fractions of less than thirty-percent for a period of more than twelve months, and that an exercise tolerance test showed an inability to perform work at a measured workload equivalent of five METs or less.  *Frank K. v. Kijakazi*, 21-CV-0211, 2022 WL 17125879, at *2 (W.D.N.Y. Nov. 22, 2022).  In addition, the court in *Frank K.* noted that the ALJ had acknowledged at the hearing that the plaintiff "might meet or equal a listing" such that obtaining expert testimony from a cardiologist would be warranted, yet did not ultimately obtain such testimony and instead explained only that there was "no evidence" to support that plaintiff met or equaled the listing.  *Id.*  As will be discussed, the evidence in this case, which the ALJ detailed in other parts of his decision, does not suggest that plaintiff may have met or equaled a listing, and the ALJ here did obtain testimony from a medical expert cardiologist, who specifically opined that, based on his assessment of the record evidence, plaintiff does not appear to meet or equal the criteria of Listing 4.02.

As was noted above, the ALJ acknowledged that, although plaintiff reported symptoms such as lightheadedness and shortness of breath, treatment notes from outside of his period of hospitalization did not generally corroborate those subjective reports.  AT 17-18.  The ALJ also acknowledged that medical expert Dr. Krishnamurthi testified, after reviewing the relevant evidence, that plaintiff's cardiac condition does not meet Listing 4.02.  AT 17.  Although such statement speaks to an issue reserved to the Commissioner, the ALJ's reliance on Dr. Krishnamurthi's testimony overall, which included an explanation for his opinion regarding that listing, serves to provide an indication of the reasons the ALJ also concluded plaintiff's condition does not meet or equal a listing.  This discussion provides sufficient evidence from which the court can glean the specifics of the basis for the ALJ's finding that there is no evidence that plaintiff meets all of the relevant requirements of Listing 4.02.

Plaintiff's argument also ignores the fact that a listing can only result in a finding of disability where the conditions meeting or equaling that listing are documented as being consistently present for a period meeting the durational requirements to establish disability.  Even though plaintiff is correct that the record shows ejection fraction results below at or below thirty-percent at times, and in some instances, symptoms such as fluid

retention and shortness of breath, there is no evidence that they persisted

for a period of twelve months or longer as required for a finding of disability.

*See Anechiarico v. Comm'r of Soc. Sec.*, 15-CV-0163, 2016 WL 11478206,

at *7 n.3 (N.D.N.Y. July 12, 2016) (Carter, M.J.) (noting that "[i]f a plaintiff's

impairment, or combination of impairments, matches one listed in the

Listings, and *satisfies the duration requirement in 20 C.F.R. §§ 404.1509,*

*416.909*, then the ALJ should generally find the plaintiff disabled without

considering the plaintiff's age, education, and work experience") (emphasis

added); 20 C.F.R. § 416.909 (stating that an impairment, as is relevant

here, must have lasted or be expected to last for a continuous period of at

least 12 months").  Specifically, plaintiff was found to have ejection fraction

of fifty-five-percent in November of 2018, and it was not until November of

2019, when he was experiencing an exacerbation of his chronic heart

failure with the presence of pulmonary emboli and pleural effusion, that his

ejection fraction was assessed to be at fifteen-percent.  AT 605, 1027.

Although a repeat echocardiogram in December of 2019 again showed an

ejection fraction of fifteen-percent, another conducted at the end of January

2020, following ongoing treatment, showed some improvement such that

his ejection fraction was approximated at between twenty-five and thirty-

percent.  AT 1154, 1159.  By August 2020, another echocardiogram

revealed an ejection fraction of approximately sixty-one-percent.[10]  AT

1355.  Further, as was discussed above, the relevant symptoms plaintiff

points to are documented in the medical evidence only for a period of a few

months surrounding his acute period of illness.  Although the ALJ did not

specifically address whether plaintiff's period of low ejection fraction

findings met the durational requirement, he did discuss all of these findings,

including the dates on which they were made, and it is ultimately plaintiff's

burden to show that he is disabled at step three of the sequential

evaluation; a clear failure to produce evidence documenting the existence

of certain necessary symptoms for the required twelve months renders any

failure by the ALJ to conduct a more detailed assessment merely harmless

in this case.

Finally, I note that, as plaintiff himself acknowledges, Listing 4.02

requires that he show that he meets the requirements of both parts A and B

of the listing.  However, plaintiff offers little argument as to how he

apparently meets any of the requirements of part B, other than to point to

symptoms documented only during his acute exacerbation, or to his

---

[10]     A treatment note from the same month reported that a recent echocardiogram
showed an ejection fraction of sixty-four-percent, although it is not clear whether this
was referring to a different echocardiogram or was merely a misreading or scrivener's
error related to the echocardiogram performed in early August.  AT 1378.

subjective reports that symptoms continue and severely limit his ability to perform nearly any activities of daily living independently.  Dkt. No. 10, at 24-25.  Significantly, the ALJ discussed the relevant evidence and concluded that plaintiff's subjective reports are not wholly consistent with the evidence in the record.  Plaintiff has not directly challenged that finding, and, having reviewed the ALJ's decision and the evidence in the record, I see no error in the ALJ's choice to decline to rely on plaintiff's reports of severe limitations.  I note, once again, that it is plaintiff's burden to show he meets all of the requirements of the relevant listing.  Consequently, plaintiff's failure to raise even a facial showing that there was evidence the ALJ improperly considered or ignored that would support that he meets any of the criteria of part B, I find no error in the ALJ's failure to make a more explicit discussion of whether or not plaintiff meets that portion of the listing.

## IV.   SUMMARY AND RECOMMENDATION

After considering the record as a whole and the issues raised by the plaintiff in support of his challenge to the Commissioner's determination, I recommend a finding that the determination resulted from the application of proper legal principles and is supported by substantial evidence.  Accordingly, it is hereby respectfully

RECOMMENDED that the Commissioner's decision be AFFIRMED,

33

defendant's motion for judgment on the pleadings (Dkt. No. 12) be

GRANTED, plaintiff's motion for judgment on the pleadings (Dkt. No. 10) be

DENIED, and plaintiff's complaint be DISMISSED.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days

within which to file written objections to the foregoing report.  Such

objections shall be filed with the Clerk of the Court.  <u>FAILURE TO OBJECT

TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE

APPELLATE REVIEW</u>. *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993)

(citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir.

1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

Dated:     September 21, 2023
           Syracuse, NY

_____

DAVID E. PEEBLES
U.S. Magistrate Judge